UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA :
:
v. : Cr. No. 05-010-01S
:
LUIS TOBAL-ALMONTE :

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS OBJECTION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

On May 27, 2005, the Court held a hearing on the Defendant's motion to suppress statements. The government offered the testimony of two witnesses, Detective Ryan Gwaltney of the Charlestown Police Department and HIDTA, and Detective Kevin O'Brien, of the Rhode Island State Police and HIDTA[1]. Defendant testified on his own behalf. Based on the evidence in the record, the government submits that it has surpassed its preponderance of the evidence burden and shown that the Defendant's waiver was both knowing and voluntary and that there was no coercion. Accordingly, Defendant's statements are admissible.

Summary of the Evidence

The government's first witness, Detective Gwaltney, testified that[2]: (1) he was stationed at a side entrance to Garden City Parking lot on the date of arrest; (2) he saw the defendant after he was taken into custody, and at that time he was in handcuffs; (3) the Defendant was placed in the back seat of Detective Gwaltney's vehicle for transport to the FBI Providence Field Office

[1] HIDTA stands for High Intensity Drug Trafficking Area. This Task Force is comprised of federal, state and local law enforcement officers.

[2] At this time, the government does not have a transcript of the hearing. The summaries have been compiled using notes taken during the course of the testimony.

("FBI"); (4) the Defendant asked, in English, what he was being charged with; (5) Detective Gwaltney then advised the Defendant of his Miranda rights in English; (6) the Defendant indicated that he understood his rights; (7) no questioning of the Defendant took place in the car; (8) the Defendant did not ask for an attorney; and (9) the Defendant gave no indication that he did not understand his rights. On cross-examination, Detective Gwaltney added that he did not have any contact with the Defendant other than transporting him. Detective Gwaltney also testified as a rebuttal witness that (1) the Defendant's arrest was called out at 12:11 p.m.; (2) the Defendant's transportation to the FBI office commenced at about 12:35 p.m.; and (3) they did not arrive at the FBI office until about 20 minutes later– at about 1 p.m.

The government also called Detective Kevin O'Brien. Detective O'Brien testified that: (1) he first met the Defendant in the conference room of the FBI field office; (2) he began by verbally advising the Defendant of his Miranda rights and that Detective O'Brien used an Advice of Rights Form; (3) the Rights Form was in English, and the conversation was conducted in English; (4) the Defendant appeared to read the form, stated that he understood the form, and then signed the form; (5) the Defendant never indicated that he did not understand English; (6) the Advice of Rights form (entered into evidence) shows that it was signed at 1:14 p.m.; (7) Detective O'Brien then explained to the Defendant that the Detective would like to tape record the Defendant's statement, explained the reasons for wishing to tape record the statement, and explained what questions the Detective would be asking the Defendant; (8) Special Agent Michael Morehead spent some time locating a tape recorder. The government next introduced

the tape recorded statement of the Defendant.[3] Detective O'Brien testified that he recognized the voices on the tape. The taped statement consisted of questions by Detective O'Brien and SA Michael Morehead, asked in English, and the responses by the Defendant, also in English.

On cross-examination Detective O'Brien testified that: (1) he first saw the Defendant in the parking lot of Garden City Mall after he was arrested, but the Detective did not speak to the Defendant at the scene; (2) the next time the Detective saw the Defendant was at the FBI office; (3) during the time period between the signing of the Miranda form (1:14 p.m.) and the taped statement (2:20 p.m.), Agent Morehead looked for a tape recorder and Detective O'Brien explained to the Defendant what would transpire and attempted to put the Defendant more at ease; (4) Detective O'Brien did not recall anyone other than Agent Morehead and himself in the room with the Defendant; (5) Detective O'Brien did not remember who told him about the location of the guns or drugs found during the search warrant; (6) the Defendant had a noticeable Spanish accent; (7) Detective O'Brien did not offer the Defendant a Spanish Miranda form and he did not have access to a Spanish speaking interpreter, although he assumed one could have been located if there had been any indication that there was a need for one; (8) Detective O'Brien did not know that Miguel Martine (the other individual arrested that day, and referred to on the tape) was the Defendant's brother at the time of the Defendant's statement; (9) Detective O'Brien did not tell the Defendant anything about Mr. Deleon; (9) Detective O'Brien told the Defendant that if the gun and cocaine were his, then the Defendant should accept responsibility, otherwise, they would continue to investigate whose gun and cocaine it was; (10) Detective O'Brien did not

[3]The tape was not admitted into evidence in full, but was played at the hearing without objection. The transcript of the taped statement was admitted as a full exhibit.

recall anyone telling the Defendant that [Silvio] Deleon would not be charged; (11) Detective O'Brien did not recall anyone else speaking with the Defendant; (12) Detective O'Brien did not recall starting over with a second tape. On redirect, Detective O'Brien added that he did not see anyone questioning the Defendant at the time of arrest; that he was aware that this was a long-term investigation involving numerous undercover buys; and that the undercover officer only speaks English.

The Defendant testified as follows: (1) he did not remember whether Detective Gwaltney read him his Miranda rights; (2) Detective Gwaltney asked the Defendant if he had any guns on him; (3) when the Defendant arrived at the FBI office he was told he was arrested, asked if he wanted to cooperate, and asked who his drug supplier was; (4) he was not immediately advised of his rights, but was asked questions first; (5) he was asked to make some phone calls before he was advised of his rights; (6) he was told that the police could help him stay in the country, that he was more valuable outside of the prison, and that he needed to lead the police to people who had more cocaine than he did; (7) defendant was nervous and he agreed to call people to set up a deal at the Defendant's house at 6 p.m. that evening; (8) these conversations were recorded; (9) he was told that he would not be released but would get a shorter sentence; (9) he was told that if he took responsibility, his family would be let go; (10) he agreed because he was nervous for his family; (11) Agent Morehead told the Defendant about the search warrant before the Defendant was read his rights; (12) the Defendant was asked if there was any more cocaine, and when he denied it, he was asked about the cocaine and gun in the basement and he denied any knowledge of them; (13 ) he was told that if he took responsibility for the cocaine and gun then his family would be let go; (14) by family he meant DeLeon and his brother (Martine), but the Defendant

further admitted that at that time he had not told the FBI that Martine was his brother; (15) it was after all this had taken place that the tape recorded statement was made; (16) he did not understand his rights; (17) he did not understand that he could refuse to talk; (18) he did not understand that he could have an attorney; (19) he had never been arrested "like that" before; (20) it had been a long time since he was arrested.

On cross-examination, the Defendant testified as follows: (1) he had been arrested for gang assault in Manhattan as a result of his brother's actions; (2) he was arrested and convicted in 1999; (3) he was arrested again in 2000 for menacing and stalking; (4) he was brought to court and advised of his rights by the judge; (5) at the time of his arrest, he had 1 kilogram of cocaine; (6) prior to that he had sold cocaine to the undercover officer; (7) his dealings with the undercover officer were all in English; (8) he spoke with the undercover officer on the telephone in English; (9) he was certain that Detective Gwaltney arrested him; (9) he was asked to call a bigger drug dealer, and it had to be set up for 6 p.m.; (10) he agreed to call an individual by the name of Helpes (sp?) whom he had met two years ago; (11) he came to the United States in 1993 (he later testified that he was 13-14 years old at the time); (12) it is his signature on the Miranda rights form; (13) all of the Defendant's cooperation took place before the signing of the Miranda rights form; (14) the Defendant made a few calls, including to a pager, waited for a return call from Helpes and this all took time, about 20-35 minutes; (15) he also signed a cooperation document, but did not remember whether he signed the cooperation agreement or the Advice of Rights form first; (16) he refused to tell the FBI who supplied him with the cocaine because he was concerned about his family; (17) nothing happened as a result of his refusal to reveal his source of supply; (18) he was interviewed by Pretrial Services about his background for about 30

minutes – the interview took place in English without an interpreter; (19) it was the Defendant's voice in the tape recorded statement. In response to the Court's questions, the Defendant stated that during his previous court appearances/arrests he had been advised of his rights in Spanish.

During closing arguments, the Court inquired of the government whether it had any records or tape-recordings memorializing the cooperation by the Defendant. The government asked the Court for a continuance in order to determine whether such tapes existed, and, if so, whether the tapes memorialize the time of the phone calls placed by the Defendant. The Court continued the hearing until June 1, 2005. The government expects Agent Morehead to testify that: (1) no questioning of the defendant took place prior to the signing of the Miranda rights form at 1:14 p.m.; that (2) Agent Morehead was not informed of the presence of cocaine and a firearm in the basement until some time after 1:30 p.m., which is when the search team obtained consent to search the basement of 64 Bergen Street[4]; (3) no cooperation by the defendant, in the form of placing telephone calls or otherwise, took place until after the Miranda Rights form were signed at 1:14 p.m.; (4) while defendant did agree to place phone calls, it is unclear whether they were ever recorded, but in any event, no such recordings were maintained because the cooperation came to nothing.

Argument

The burden is on the government by a preponderance of the evidence to prove that the statements made by the Defendant were voluntary. Lego v. Twomey, 404 U.S. 477 (1972); United States v. Rosario-Diaz, 202 F.3d 54, 69 (1st Cir. 2000). The test for voluntariness is

[4] 1:30p.m. is the time recorded as the time at which the consent to enter the basement was obtained. See Exhibit 1, attached (Report by the lead FBI agent on the search team, Special Agent Justin Bower). Thus, the evidence was not found until after 1:30.

whether, under the totality of the circumstances, law enforcement officials have overborne the will of the accused. Haynes v. Washington, 373 U.S. 503, 513-14 (1963). The factual inquiry focuses on (1) the conduct of law enforcement officials in whether they created pressure, and (2) the suspect's capacity to resist that pressure. See Mincey v. Arizona, 437 U.S. 385, 399-401 (1978). Absent a finding of police coercion, the waiver and subsequent statements should be viewed as voluntary, thereby removing any constitutional bar to the admission of those statements into evidence at trial. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986).

In this case, the evidence is overwhelming that the Defendant's statements were obtained following a knowing and voluntary waiver of rights and that there was no coercion in obtaining those statements. The Court is in the best position to evaluate the credibility of the witnesses. The Court first heard from Detective Gwaltney, a 15-year veteran of the Charlestown Police Department. Detective Gwaltney testified that he informed the Defendant of his Miranda rights after the Defendant was placed in Gwaltney's car. Detective Gwaltney's testimony is uncontroverted. Significantly, the Defendant claimed that he did not *remember* whether Detective Gwaltney informed the Defendant of his rights. The only question the Defendant even claimed that Detective Gwaltney asked the Defendant was whether he had any guns on him. The Defendant's testimony is not credible. The Defendant was already in custody, in handcuffs; presumably the Defendant had already been searched for weapons. There was no reason for Detective Gwaltney to inquire of the Defendant whether he had a gun.

The Court also heard from Detective O'Brien, a 13-year veteran of the Rhode Island State Police. Detective O'Brien testified that he informed the Defendant of his Miranda Rights verbally in English and then again using the written Miranda Rights form. The Detective's

testimony is corroborated by the Rights form which states that the form was signed on January 19, 2005, at 1:14 p.m. The form is signed, by the Defendant, Detective O'Brien, and Special Agent Morehead. There is *no evidence whatsoever* in the record that the date or time on the form are inaccurate. Defense counsel, on cross examination, did not elicit *any uncertainty*, let alone contradiction, regarding the 1:14 p.m. time on the form. The Defendant did not contest nor deny that 1:14 p.m. was the time when he signed the Advice of Rights form. The Defendant admitted in his tape recorded statement that he had been read his rights prior to providing the tape-recorded statements. There is no suggestion by anyone, that the time on the tape-recording is inaccurate. There is no support in the record that the 1:14 p.m. is inaccurate. Any such claim by the Defendant is pulled out of thin air. Not only would such a claim be false, but it is also of no avail to the Defendant. The Defendant had already been informed of his Miranda rights by Detective Gwaltney. Put simply, the timing of all subsequent Miranda warnings is not determinative of any issue here. Furthermore, there is absolutely no basis for rejecting the accuracy of the time as it is set forth on the Advice of Rights form.

The Defendant's testimony is that everything took place prior to his signing the Miranda rights form. The Defendant is not to be believed. The Defendant has a strong motive to prevaricate in an attempt to win his motion to suppress. Not only does he face a lengthy period of incarceration if convicted for distributing the kilogram of cocaine, he faces an additional mandatory five year sentence, that must be imposed consecutively to any sentence of incarceration he receives for distributing the cocaine. The Defendant's statement reflects his ownership and knowledge of both the drugs and a gun in the basement. The Defendant, without prompting, described how the gun was wrapped in a sock, and that they were hidden in the

ceiling. The Detective questioning the Defendant did not know this at the time the Defendant volunteered it. Second, the Defendant testimony, that his attempted cooperation all took place prior to his signing the Miranda rights form, is demonstrably false. Detective Gwaltney testified that he did not even bring the Defendant to the FBI until 1 p.m.. The form was signed at 1:14 p.m.. There was not enough time to even begin to obtain a detailed confession from the Defendant, obtain further information concerning his various drug suppliers, make arrangements for a controlled delivery, place numerous phone calls and talk to the supplier. Furthermore, to accept this irrational posit by the defense, is to accept that the police, accomplished all of this in 14 minutes, while at the same time questioning, processing and dealing with the three men they had in custody (Miguel Martine, Silvio DeLeon, and the Defendant), while simultaneously searching the 64 Bergen Street apartment, pursuant to a search warrant. Stretching finite law enforcement resources this thin by setting up additional drug deals, all within 14 minutes, would have been impossible; it defies common sense.

The Defendant also deviates from the truth in his claim as to when the police informed him of what was found during the search warrant. The Defendant claims that he was told about the gun and the drugs before he signed the Miranda form, at 1:14 p.m.. Once again, the Defendant's claim is demonstrably false. The police did not even obtain permission to enter the basement of 64 Bergen Street until 1:30 p.m., and thus, did not enter the basement until after that time. Additional time must then be added while the police searched the basement before locating the gun and drugs in the ceiling.

The Court should also consider the Defendant's lack of candor in discussing his prior criminal record. On direct examination by his attorney, the Defendant first stated that he had

never been arrested "like this" before, and then claimed that he was only arrested a long time ago. In fact, on cross examination, the Defendant admitted that he had been arrested twice before, in 1999 and 2000 – not so long ago. And the Defendant did not simply admit and take responsibility for his prior arrests and convictions. Instead, the Defendant attempted to avoid any admission of guilt, offering excuses for his prior involvement with the criminal justice system. The Defendant's prior contact with the New York Judicial system if relevant for two reasons. One, it contradicts his attempt on direct questioning by his attorney to create the impression that he was overwhelmed by his arrest in Rhode Island. This was not some high school kid who got grabbed by the police for the first time in his life. This was a man who was arrested for crimes of violence, who was quite familiar with what it was like to be arrested. He admitted that he was arrested, handcuffed, fingerprinted, photographed and placed in custody, on at least two prior occasions. Secondly, in response to the Court's questioning, this Defendant admitted that he had been advised of his Miranda rights, on at least two prior occasions, in court *in Spanish*. The Defendant's claim that, on January 19, 2005, he did not grasp the meaning of Miranda given to him in English is simply not credible. Clearly, the Defendant, having heard these rights before in his native tongue, and given his grasp of the English language as well, would have no difficulty understanding the rights given three more time on January 19, 2005. Further, the Defendant's claim, under oath, that he did not understand his Miranda rights defies reason. This man admitted that he understood everything else the police asked him to do that night. The recorded statement is proof of his ability to understand and communicate in the English language. He admitted that all of his dealings with Pre Trial services were in English. The government also requests that this Court take judicial notice of the fact that the Defendant, on more than one

occasion, 1) corrected the court certified interpreter's English translation, 2) responded in English, and 3) responded before a complete Spanish translation had been given.

Once this Court accepts either that Detective Gwaltney informed the Defendant of his Miranda rights prior to transporting him to the Providence FBI office or that Detective O'Brien informed the Defendant of his Miranda rights at 1:14 p.m., or accepts both facts as true, then the only remaining question is whether any undue coercion of the Defendant occurred. This issue can be dealt with quickly. There is no evidence, whatsoever, that this occurred, regardless of whose version of events the Court accepts. Even if the Defendant had testified truthfully, by the Defendant's own account, there is nothing that remotely rises to the level of coercion. Certainly, the fact that the Defendant tried to help himself with the police by virtue of cooperating - whenever that cooperation took place – does not point to coercion. More relevant is the fact that the Defendant admitted that he was questioned by only two agents. He was in a conference room at the FBI office. He had been in custody only a short time prior to the time questioning began. The most the Defendant can claim on this point is that he took responsibility for the cocaine and the gun because he did not want his family to be charged. This was a calculated choice by the Defendant, but it was not the product of any police coercion. Indeed, as the Defendant must admit (again, because of the existence of the recorded statement) the police had no idea that Martine was, in fact, the Defendant's brother. The evidence further shows that the police did not have a reliable basis for believing that a familial relationship existed between DeLeon and the Defendant – they only had Defendant's word that DeLeon was his cousin. And DeLeon initially denied that he was the Defendant's cousin. Thus, the police did not threaten the Defendant's family at any time. In addition to considering Detective O'Brien's testimony and demeanor,

which was candid and truthful in all respects, it was impossible that such a threat could have taken place. Cf. Thompson V. Haley, 255 F.3d 1292, 1297 (11th Cir. 2001)(holding that whether a threat to prosecute a third party was coercive depends upon whether the state had probable cause to believe that the third party had committed a crime at the time that the threat was made). See also, United States v. Haynes, 301 F.3d 669, 684 (6th Cir. 2002)(Police threatening to take legal action against Defendant's girlfriend and Defendant's daughter did not constitute coercion).

The government also directs the Court's attention to the fact that the defendant refused to disclose who supplied him with the kilogram of cocaine. This is additional proof that the Defendant not only understood his right to refuse to answer questions at any time, but in fact exercised that right. As the tape recorded statement demonstrates, Detective O'Brien simply accepted the Defendant's refusal on that point and moved on. The Defendant admitted, on cross examination, that nothing untoward happened to him when he refused to answer that question. The Defendant also felt free to lie to the police about Martine's true name and then he claimed that Martine was his "friend". The Defendant denied that DeLeon had any connection to his drug dealing; even though DeLeon was observed by the police accompanying the Defendant to previous drug deals and DeLeon's voice is on tape recorded drug deals with the undercover officer. In other words, the Defendant's statement was calculated to suit the Defendant's purposes. It was made following a knowing and voluntary waiver.

## CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Honorable Court deny the Defendant's Motion to Suppress Statements.

Respectfully submitted,

UNITED STATES OF AMERICA
By its Attorneys,

ROBERT CLARK CORRENTE
United States Attorney

MARY E. ROGERS
Assistant U.S. Attorney

S/ Adi Goldstein

ADI GOLDSTEIN
Assistant U.S. Attorney

Certificate of Service

I hereby certify that on the 31st day of May, 2005, a copy of the within Government's Objection and Memorandum in Opposition to Defendant's Motion to Suppress Statements was mailed, postage prepaid, to Kevin Fitzgerald, Assistant Federal Defender, 10 Weybosset Street, Suite 300, Providence, RI 02903.